1  Robert F. McCauley (SBN 162056)
   robert.mccauley@finnegan.com
2  Jacob Schroeder (SBN 264717)
   jacob.schroeder@finegan.com
3  Jeffrey D. Smyth (SBN 280665)
   jeffrey.smyth@finnegan.com
4  Arpita Bhattacharyya (*pro hac vice*)
   arpita.bhattacharyya@finnegan.com
5  FINNEGAN, HENDERSON, FARABOW,
     GARRETT & DUNNER, LLP
6  3300 Hillview Avenue
   Palo Alto, California  94304
7  Telephone:    (650) 849-6600
   Facsimile:    (650) 849-6666
8
   Attorneys for Defendant and Counterclaimant
9  ASETEK DANMARK A/S

10

11                UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                  SAN FRANCISCO DIVISION

14

15  ASIA VITAL COMPONENTS CO., LTD.,          CASE NO. 3:16-cv-07160-JST

16              Plaintiff and                 **DEFENDANT ASETEK DANMARK
                Counterdefendant,             A/S'S OPENING CLAIM
17                                            CONSTRUCTION BRIEF
            v.                                REGARDING U.S. PATENT NOS.
18                                            8,240,362 AND 8,245,764**
    ASETEK DANMARK A/S
19
                Defendant and
20              Counterclaimant.              Hearing Date: November 7, 2017
                                              Time:         1:30 p.m.
21                                            Courtroom:    9, 19th Floor
                                              Judge:        Hon. Jon S. Tigar
22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.  INTRODUCTION ..........................................................................................................1

II.  STATEMENT OF RELEVANT FACTS ......................................................................1

    A.  Technical Background ........................................................................................1

    B.  The Asetek Patents and the Claimed Invention .................................................2

    C.  Relevant Prosecution History of the '362 and '764 patents ...................................6

        1.  The '362 patent ......................................................................................6

III.  LEGAL PRINCIPLES OF CLAIM CONSTRUCTION ..............................................7

IV.  ARGUMENT ...............................................................................................................8

    A.  "Reservoir" (the '362 and '764 patents) ..............................................................8

    B.  "Substantially Circular Passageway" ('362 patent)..............................................10

    C.  "Positioned On" ('362 and '764 patents)...............................................................13

    D.  "Horizontal Wall" ('362 patent) .........................................................................15

    E.  "Substantially Circular Passageway Positioned on the Horizontal Wall" ('362 patent) .....................................................................................................16

    F.  "Fluidly Coupled" ('362 and '764 patents) ..........................................................17

    G.  "Placed in Separable Thermal Contact" ('362 patent)..........................................19

    H.  "Separably Thermally Coupling" ('362 patent).....................................................20

    I.  "The Heat Exchange Interface Being Removably Attached / Coupled To The Reservoir" ('362 patent) ...................................................................................20

V.  CONCLUSION.............................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anchor Wall Sys. Inc. v. Rockwood Retaining Walls, Inc.*,
   340 F.3d 1298 (Fed. Cir 2003)...................................................................................11

*Apple Inc. v. Motorola, Inc.*,
   No. 1:11-cv-08450, 2012 WL 8123793 (N.D. Ill. 2012) ..........................................11

*Becton, Dickinson and Co. v. Tyco Healthcare Group*,
   616 F.3d 1249 (Fed. Cir. 2010)..................................................................................14

*Chamberlain Grp., Inc. v. Lear Corp.*,
   516 F.3d 1331 (Fed. Cir. 2008)....................................................................................7

*Control Resources, Inc. v. Delta Electronics, Inc.*,
   133 F. Supp. 2d 121 (D. Mass. 2001) ........................................................................12

*Ecolab, Inc. v. Envirochem, Inc.*,
   264 F.3d 1358 (Fed. Cir. 2001)..................................................................................11

*In re Glaug*,
   283 F.3d 1335 (Fed. Cir. 2002)............................................................................21, 22

*Goldenberg v. Cytogen, Inc.*,
   373 F.3d 1158 (Fed. Cir. 2004)............................................................................19, 21

*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*,
   488 F.3d 982 (Fed. Cir. 2007)....................................................................................19

*Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*,
   790 F.3d 1298 (Fed. Cir. 2015)............................................................................21, 22

*Level One Commc'ns, Inc. v. Seeq Tech., Inc.*,
   987 F. Supp. 1191 (N.D. Cal. 1997) ..........................................................................18

*Lexion Med., LLC v. Northgate Techs., Inc.*,
   641 F.3d 1352 (Fed. Cir. 2011)....................................................................................7

*Markman v. Westview Instruments, Inc.*,
   517 U.S. 370 (1996)......................................................................................................7

*MEMS Tech. Berhad v. Int'l Trade Comm'n*,
   447 Fed. App'x 142 (Fed. Cir. 2011)..........................................................................18

*Nystrom v. TREX Co.*,
   424 F.3d 1136 (Fed. Cir. 2005)....................................................................................8

1

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008)......................................................................7, 21

2

3

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)........................................................7, 8, 10, 14

4

*Playtex Products, Inc. v. Proctor & Gamble Co.*,
    400 F.3d 901 (Fed. Cir. 2005)...................................................................11

5

6

*Starhome GmbH v. AT&T Mobility LLC*,
    743 F.3d 849 (Fed. Cir. 2014)....................................................................8

7

*Thorner v. Sony Computer Entertainment America LLC*,
    669 F.3d 1362 (Fed. Cir. 2012)....................................................13, 14, 15

8

9

*Vitronics Corp. v. Conceptronic, Inc.*
    90 F.3d 1576 (Fed. Cir. 1996)..............................................................7, 16

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.      INTRODUCTION

AVC brought the instant declaratory judgment suit against Asetek seeking judgment of non-infringement and invalidity of Asetek's U.S. Patent Nos. 8,240,362 ("the '362 patent") and 8,245,764 ("the '764 patent") (collectively "Asetek Patents"). Asetek in turn has counterclaimed that the AVC products-at-issue infringe certain claims of the Asetek Patents. Although the parties agree on the construction of one claim term ("double-sided chassis"), they dispute the meaning of nine terms from the Asetek Patents, which are addressed in this opening brief.

Asetek's proposed constructions are true to the scope of the claims and are grounded in the intrinsic record of the Asetek Patents. Asetek relies on limited extrinsic evidence (the expert declaration of Dr. Donald E. Tilton, "Tilton Decl.") for the purpose of clarifying technical concepts and in a manner that is consistent with the intrinsic evidence. In contrast, AVC's proposed constructions are unsupported by the intrinsic record, overly limiting, and inconsistent with the plain language of the claims. Accordingly, and for the reasons set forth more fully below, Asetek respectfully submits that the Court should adopt Asetek's proposed construction for each disputed term.

# II.     STATEMENT OF RELEVANT FACTS

## A.      Technical Background

Computers (and particular their central processing units, or "CPUs") generate heat during operation, which must be dissipated efficiently and effectively in order for computers to operate reliably. Tilton Decl., ¶10. As technology advances and computers become faster and more powerful, they generate increasing amounts of heat that must be managed. *Id.* Various heat dissipation methods, including air cooling and liquid cooling, are used to manage heat in computer systems. *Id.* at ¶11. While air cooling systems are cheaper and easier to install, they are not as efficient as liquid cooling at heat removal. *Id.*

Prior art liquid cooling systems were bulky and posed significant risk of leakage from having several components (such as a heat exchanger, a liquid reservoir, a pump, and a heat radiator) coupled together using tubes. *Id.* Such a configuration is illustrated in Prior Art Figure 3 of the Asetek Patents, showing a prior art heat exchanger 7, a prior art liquid reservoir 8, a prior art pump

9, and a prior art heat radiator 11 connected in a closed loop using tubes. Declaration of Arpita

Bhattacharyya in Support of Asetek's Opening Claim Construction Brief Re: U.S. Patent Nos.

8,240,362 and 8,245,764 ("Bhattacharyya Decl."), Ex. 1 [the '362 patent] at col. 1, ll. 13-50. (All

exhibits are attached to the Bhattacharyya Declaration and referred to as "Ex. ___.")



*FIG. 3*

The liquid cooling technology described and claimed in the Asetek Patents addressed this

leakage problem, among others, and resulted in a highly efficient yet compact (narrow profile) liquid

cooling device that has been widely accepted by the industry (and copied by competitors). *See* Tilton

Decl., ¶13.

**B.    The Asetek Patents and the Claimed Invention**

The asserted claims of the '362 and the '764 patents are directed to a liquid cooling device

comprising a specific structure—a dual-chambered reservoir bounded by a cold plate. Tilton Decl.,

¶12. In the '362 patent, the dual chambers in the recited "reservoir" are termed the "upper chamber"

and the "lower chamber" (Ex. 1, e.g., claim 14), whereas in the '764 patent the dual chambers in the

recited "reservoir" are termed the "pump chamber" and the "thermal exchange chamber." (Ex. 2 [the

'764 patent], e.g., claim 1). *Id.* In both patents, the cold plate (which forms the boundary wall of the

reservoir and is placed in thermal contact with the heat generating unit) is termed the "heat

exchanging interface." *Id.*

Although the specifications of the '362 and '764 patents are very similar, the patents are neither directly related,[1] nor are they identical.  Nevertheless, the parties agree that certain similar claim terms (e.g., "reservoir," "positioned on," and "fluidly coupled") in the two patents should be construed to have the same meaning. The parties additionally agree that the claim term "double-sided chassis" in claim 1 of the '764 patent should be construed as: "a two-sided frame or housing, each side of which has a purpose."

Claim 14 of the '362 patent (Ex. 1) is representative of the asserted claims in that patent (with the disputed terms emphasized):

> 14. A cooling system for a processing unit positioned on a
>
> motherboard of a computer, comprising:
>
> a **reservoir** configured to be coupled to the processing unit positioned on the motherboard at a first location, the reservoir being adapted to pass a cooling liquid therethrough, wherein the reservoir includes an upper chamber and a lower chamber, the upper chamber and the lower chamber being separate chambers containing cooling liquid that are separated by at least a horizontal wall and **fluidly coupled** together by one or more passageways, at least one of the one or more passageways being a **substantially circular passageway positioned on the horizontal wall**, the reservoir further including a heat exchanging interface configured to be **placed in separable thermal contact** with the processing unit, **the heat exchanging interface being removably attached to the reservoir** such that the heat exchanging interface forms a boundary wall of the lower chamber of the reservoir;
>
> a heat radiator configured to be positioned at a second location horizontally spaced apart from the first location when the reservoir is coupled to the processing unit;
>
> a fan adapted to direct air to the heat radiator to dissipate heat from the cooling liquid to surrounding atmosphere;
>
> a pump configured to circulate the cooling liquid between the reservoir and the heat radiator, the pump including a motor having a rotor, a stator, and an impeller having curved blades, the impeller being mechanically coupled to the rotor and at least partially submerged in the cooling liquid in the reservoir,

---

[1] The '362 patent is a Divisional of U.S. Patent No. 7,971,632, which is a national stage entry of PCT/DK2004/000775 filed November 8, 2004, which in turn claims priority to U.S. Provisional Application No. 60/517,924. The '764 patent is a continuation of abandoned U.S. Application No. 11/919,974, which was a national stage entry of PCT/DK2005/000310 filed May 6, 2005.

1     wherein a speed of the impeller is configured to be varied independent of the speed of the fan.

2     Similarly, representative claim 1 of the '764 patent (Ex. 2) is stated below, with the disputed

3 terms in bold:

4     A cooling system for a heat-generating component, comprising:

5     a double-sided chassis adapted to mount a pump configured to circulate a cooling liquid, the pump comprising a stator and an

6     impeller, the impeller being **positioned on** the underside of the chassis and the stator being **positioned on** the upper side of the chassis and

7     isolated from the cooling liquid;

8     a **reservoir** adapted to pass the cooling liquid therethrough, the reservoir including:

9

10     a pump chamber including the impeller and formed below the chassis, the pump chamber being defined by at least an impeller cover having one or more passages for the cooling liquid to pass through;

11

12     a thermal exchange chamber formed below the pump chamber and vertically spaced apart from the pump chamber, the pump chamber and the thermal exchange chamber being separate chambers that are

13     fluidly coupled together by the one or more passages; and

14     a heat exchanging interface, the heating-exchanging interface forming a boundary wall of the thermal exchange chamber, and configured to

15     be placed in thermal contact with a surface of the heat-generating component; and

16

17     a heat radiator **fluidly coupled** to the reservoir and configured to dissipate heat from the cooling liquid.

18     Identical Figure 15 in both the '362 and '764 patents and Figures 17 and 20 of the '764

19 patent represent embodiments of the claimed invention. As shown by the figures, rather than

20 coupling together multiple separate components (as in the prior art), the claimed invention has,

21 among other features, a single receptacle (i.e., reservoir 14) divided into chambers that are vertically

22 spaced apart and that are fluidly coupled to allow for heat dissipation via the heat exchanging

23 interface (4). Tilton Decl., ¶12. This is illustrated in annotated Figure 15 from both patents and

24 annotated Figure 20 of the '764 patent:

25

26

27

28



**Figure 15 of the '362 patent**



**Figure 20 of the '764 patent**

Additionally, as illustrated in Figure 8 of the '362 patent (and identical Figure 7 of the '764 patent), the claimed invention also comprises a radiator (11), tubing (24 and 25) that connects the pump unit (including the reservoir) to the radiator, and fan (10) to blow air through the radiator. *See* Ex. 1 at col. 13, ll. 28-41.

**C.      Relevant Prosecution History of the '362 and '764 patents**

**1.      The '362 patent**

The prosecution history of the parent application (Appl. No. 10/578,578) to the '362 patent is relevant to the construction of certain terms of the asserted claims of the '362 patent, and is also relevant to at least the construction of the term "reservoir" as it pertains to the '764 patent.

The originally filed specification of the parent application is virtually identical to the '362 patent specification. When the applicant amended its claims in the parent application to claim, among other things, an "upper chamber" and a "lower chamber," the Examiner objected to the specification as allegedly not providing clear support or proper antecedent basis for the claimed subject matter. Ex. 3 (Office Action dated November 24, 2010) at 3. In particular, the Examiner objected to the new claim terms "upper chamber" and "lower chamber," and requested amendment of the specification. *Id*. The applicant disagreed with the Examiner's rejection, and during a subsequent interview with the Examiner, "the Examiner agreed with the Applicant that the recited upper and lower chambers of the reservoir are illustrated in the **originally filed FIG. 15**." Ex. 4 (Applicant's record of interview with Examiner dated April 4, 2011) at 11-12 (emphasis added). Thus, the Examiner explicitly found support for the claimed dual-chambered reservoir structure in Figure 15 of the '362 patent. Indeed, the Examiner confirmed this in his Notice of Allowance, in which he removed his objection and found that "Applicant's arguments, see applicant's remark, filed 4/4/2011, with respect to the objection of drawing, the 112th [sic] rejection and the art rejection have been fully considered and are persuasive." Ex. 5 (Notice of Allowance dated April 8, 2011) at 2. In fact, the Examiner allowed the applicant to amend the specification of the parent application to specifically recite an "upper chamber" and a "lower chamber." Ex. 6 (U.S. Patent No. 7,971,632) at col. 18, ll. 3-9.

Similarly, and as discussed above, identical Figure 15 of the '764 patent, as well as Figures 17 and 20 and the associated text, provide support for an embodiment of the dual chambers ("pump chamber" and "thermal exchange chamber") recited in the claims of the '764 patent.

1

### III.    LEGAL PRINCIPLES OF CLAIM CONSTRUCTION

2      Claim construction is a question of law for the Court. *Markman v. Westview Instruments,*

3  *Inc.*, 517 U.S. 370, 372 (1996). "The purpose of claim construction is to 'determin[e] the meaning

4  and scope of the patent claims asserted to be infringed.'" *O2 Micro Int'l Ltd. v. Beyond Innovation*

5  *Tech. Co*., 521 F.3d 1351, 1360 (Fed. Cir. 2008) (citation omitted). "[T]he words of a claim 'are

6  generally given their ordinary and customary meaning'. . . [which is] the meaning that the term

7  would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of

8  the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13

9  (Fed. Cir. 2005) (citation omitted).  "The customary meaning of a claim term is not determined in a

10  vacuum and should be harmonized, to the extent possible, with the intrinsic record, as understood

11  within the technological field of the invention." *Lexion Med., LLC v. Northgate Techs., Inc*., 641

12  F.3d 1352, 1356 (Fed. Cir. 2011).

13      Although "the claims themselves provide substantial guidance as to the meaning of particular

14  claim terms," they "do not stand alone," but rather "are part of a fully integrated written instrument."

15  *Phillips*, 415 F.3d at1314–15 (internal quotation marks and citation omitted). A person of ordinary

16  skill in the art "is deemed to read the claim term not only in the context of the particular claim in

17  which the disputed term appears, but in the context of the entire patent, including the specification."

18  *Id.* at 1313. Therefore, "the specification 'is always highly relevant to the claim construction

19  analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"

20  *Chamberlain Grp., Inc. v. Lear Corp.*, 516 F.3d 1331, 1335 (Fed. Cir. 2008) (quoting *Vitronics*

21  *Corp. v. Conceptronic, Inc.* 90 F.3d 1576, 1582 (Fed. Cir. 1996)). A court must, nevertheless, "avoid

22  the danger of reading limitations from the specification into the claim." *Phillips*, 415 F.3d at 1323.

23      The prosecution history is akin to the specification in that it "provides evidence of how the

24  PTO and the inventor understood the patent," and "was created by the patentee in attempting to

25  explain and obtain the patent." *Id.* at 1317. The Federal Circuit often deems the prosecution history

26  to be of "critical significance" to ascertaining "the meaning of the claims." *Vitronics*, 90 F.3d at

27  1582.

28

1    A court may also consult extrinsic evidence, such as dictionaries, treatises and expert

2    testimony to "shed useful light on the relevant art." *Philips,* 415 F.3d at 1317 (internal quotation

3    marks and citation omitted). Definitions in technical dictionaries may shed light on "the way in

4    which one of skill in the art might use the claim terms," provided that they do not "contradict any

5    definition found in or ascertained by a reading of the patent documents." *Starhome GmbH v. AT&T*

6    *Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014) (internal citation omitted); *see also Nystrom v.*

7    *TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005) ("[U]ndue reliance on extrinsic evidence poses the

8    risk that it will be used to change the meaning of claims in derogation of the [intrinsic record].").

## IV.    ARGUMENT

### A.    "Reservoir" (the '362 and '764 patents)

11    The parties agree that "reservoir" should be construed the same for the asserted claims of

12    both the '362 and the '764 patents, and have proposed the following competing constructions:

| Claim Term | Asetek | AVC |
|---|---|---|
| "reservoir" | single receptacle defining a fluid flow path | a receptacle for holding and retaining liquid |

16    The parties agree that the recited "reservoir" would generally mean "receptacle" to a person

17    of ordinary skill in the art. *See* Tilton Decl., ¶16. In the context of the '362 and '764 patents,

18    however, Asetek proposes that "reservoir" should be construed as "single receptacle defining a fluid

19    flow path" to address the additional structural features and characteristics of the "reservoir"

20    disclosed and claimed in the patents.

21    Asetek's construction of "reservoir" begins with "single receptacle...," which is consistent

22    with the intrinsic evidence. In both Asetek Patents, every reference to the "reservoir" (i.e., reservoir

23    14) is to a single receptacle. Indeed, the patents refer to "reservoir 14" interchangeably with

24    "reservoir housing 14," which undoubtedly comprises a single receptacle. *See, e.g.*, Ex. 1 at col. 15,

25    ll. 22-26; Ex. 2 at col. 22, ll. 44-53. Moreover, the claimed dual chambers (referred to as the "upper"

26    and "lower" chambers in the '362 patent, and the "pump chamber" and "thermal exchange chamber"

27    in the '764 patent) are contained *within* the single receptacle (with a "heat exchanging interface"

28    forming the lower boundary wall of the lower/thermal exchange chamber). *See, e.g.*, Ex. 1 at Figure

15; Ex. 2 at Figures 15, 17, and 20; *see also* Section II.C, *supra* (discussing support for the claimed dual chambers in Figure 15). The '764 patent specification also states, with reference to Figure 20, that the "area enclosed between the underside of the reservoir housing 14 and the heat exchange surface 4 constitutes an enclosed space for circulating the cooling liquid therethrough [that is] is divided into two separate chambers." Ex. 2 at col. 22, ll. 44-49. Thus, the chambers of Figure 20 represent separate chambers within the single receptacle, or reservoir.

Asetek acknowledges that AVC's construction of "reservoir" as "*a* receptacle" should also mean that the "reservoir" must be only one receptacle. In fact, this is similar to what Judge Chen explained in his Claim Construction Order in the prior *Asetek Holdings Inc., et al. v. CoolIT Systems, Inc.*, and *Asetek Danmark A/S v. CMI USA, Inc.* cases. Ex. 7 (Claim Construction Order) at 8 (Judge Chen wrote that inserting "single" before "reservoir" is "unnecessary because the fact that the claim term is 'reservoir' (singular) and not 'reservoirs' (plural) indicates that a reservoir is only one receptacle and not many."). Although Judge Chen's reasoning was logical, the defendants in the prior litigations played on the lack of the word "single" in the Court's claim construction to present invalidity positions in which the alleged "reservoir" was formed by connecting two separate receptacles. Bhattacharyya Decl., ¶9. Asetek respectfully submits that its proposed construction of "reservoir" as "single receptacle" would provide necessary clarification that the claimed "reservoir" is a single receptacle (that comprises dual chambers). *See* Tilton Decl., ¶17. This would serve judicial economy and reduce litigation expenses by foreclosing at the outset invalidity positions that run counter to the disclosure of "reservoir" in the '362 and '764 patents.

The parties additionally dispute the purpose and function of the claimed "reservoir." AVC's construction of "reservoir" as "a receptacle for holding and retaining fluid," could imply that the "reservoir" stores fluid in a static state without fluid flow or movement. *Id.* at ¶18. In fact, this is exactly the position that CoolIT asserted in *Asetek Holdings Inc., et al. v. CoolIT Systems, Inc.* to attempt to avoid infringement. Bhattacharyya Decl., ¶9. Although CoolIT's argument was at odds with the specification and claims, which nowhere suggest that the "reservoir" or a portion thereof "holds and retains" fluid (Tilton Decl., ¶19), CoolIT premised its argument on Judge Chen's construction of "reservoir," which included "holding a liquid or fluid." *Id*; Ex. 7 (Claim Construction

9

Order) at 8-9. This is why Asetek respectfully requests a modest but important revision of Judge

Chen's prior claim construction of the term "reservoir."

Indeed, nothing in the intrinsic record of the '362 and the '764 patents supports AVC's

"holding and retaining fluid" construction for "reservoir." The Asetek patent claims and the

description of the exemplary embodiments (e.g., Fig. 15 of the '362 patent, and Figs. 15, 17, and 20

of the '764 patent) make it clear that during the operation of the claimed cooling system, the cooling

fluid continuously flows through the fluid chambers and the passageways within the "reservoir." *Id.*

Figure 7 of both Asetek Patents further demonstrates that the claimed cooling system is a closed-

loop system where liquid is pumped continuously between radiator 11 and the pump unit[2]

comprising reservoir 14. Tilton Decl., ¶19. Thus, reservoir 14 of both Asetek Patents defines a fluid

flow path through its dual chambers and passageways, as stated in Asetek's proposed construction.

*Id.*

Furthermore, claim 14 of the '362 patent and claim 1 of the '764 patent both require that the

"reservoir" be "adapted to pass a cooling liquid therethrough." Ex. 1, claim 14; Ex. 2, claim 1. And

both claims further require that the upper/pump chamber and lower/thermal exchange chamber be

"fluidly coupled" together. *Id.* Thus, the claim language itself requires that the "reservoir" include

chambers through which the cooling liquid flows. Thus, AVC's construction, which requires the

"reservoir" to hold static fluid, i.e., without flow, contradicts the plain language of the claims. Such a

construction can never be the correct one. *Phillips*, 415 F.3d at 1312-13. Asetek's construction of

"reservoir" as "single receptacle defining a fluid flow path" best captures the meaning of the term

based on the disclosures of the Asetek Patents. The Court should therefore adopt Asetek's

construction, and reject the unclear and erroneous construction asserted by AVC.

**B.    "Substantially Circular Passageway" ('362 patent)**

The parties have proposed the following constructions for the term "substantially circular

passageway" in claim 14 of the '362 patent:

---

[2] Asetek's claimed invention has, among other features, a pump unit that combines a pump, a reservoir, and a heat exchanger (i.e., a cold plate) into a single component.

| Claim Term | Asetek | AVC |
|---|---|---|
| "substantially circular passageway" | a generally circular opening | passage with a circular exterior along at least one edge, or passage with at least one circular edge. |

Claim 14 of the '362 patent recites, *inter alia*, "at least one of the one or more passageways [fluidly coupling the upper and lower chambers] being a substantially circular passageway positioned on the horizontal wall." Ex. 1, claim 14. Asetek proposes that the term "substantially circular passageway" be defined as "generally circular opening," consistent with the plain and ordinary meaning of "substantially" and the disclosure of the '362 patent showing that the "passageway" between the "upper" and "lower" chambers is an *opening* on a surface of the "horizontal wall" separating the chambers.

The Federal Circuit has explained that "substantial" is "a meaningful modifier implying 'approximate,' rather than 'perfect.'" *Playtex Products, Inc. v. Proctor & Gamble Co.*, 400 F.3d 901, 907 (Fed. Cir. 2005) (construing the term "substantially flattened surface"). The Federal Circuit has further stated that "words of approximation, such as 'generally' and 'substantially,' are descriptive terms 'commonly used in patent claims to avoid a strict numerical boundary to the specified parameter.'" *Anchor Wall Sys. Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1310-11 (Fed. Cir 2003) (citing *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001) (internal quotes omitted)). Thus, defining "substantially circular" as "generally circular" clarifies that the "passageway" between the dual chambers must be approximately or generally, but not perfectly, circular. In fact, a person of ordinary skill in the art would readily understand "substantially circular passageway" to mean a passage or an opening that is generally circular. Tilton Decl., ¶20. This is because passages or openings having generally circular cross-sections (e.g., tubing) are routinely used for fluid transfer to minimize fluid flow resistance and reduce fluid pressure drops. *Id.*

AVC's proposed constructions of "substantially circular," on the other hand, violate the common-sense principle that a claim construction should not be harder to understand than the claim term itself. *See, e.g., Apple Inc. v. Motorola, Inc.*, No. 1:11-cv-08450, 2012 WL 8123793, *1 (N.D.

1    Ill. 2012) (Posner, J., sitting by designation) (expressing the concern "that many of the proposed

2    claims constructions are not in language intelligible to jurors" and observing "[t]here is no point in

3    giving jurors stuff they won't understand"); *Control Resources, Inc. v. Delta Electronics, Inc.*, 133

4    F. Supp. 2d 121, 127 (D. Mass. 2001) ("In the end, claim construction must result in a phraseology

5    that can be taught to a jury of lay people. . . . Thus, accurate words that convey the essence of the

6    invention are needed."). When an expert such as Dr. Tilton, whose qualifications and technical

7    experience far exceed the level of ordinary skill in the art, is confused by the terms "circular

8    exterior" of the passage, or the "at least one edge"/"at least one circular edge" of the passage in

9    AVC's constructions, then it is highly likely that such constructions will be confusing and unhelpful

10   to a jury of lay persons. *See* Tilton Decl., ¶21. In contrast, Asetek's proposed construction of

11   "substantially circular" as "generally circular" can be readily understood and applied by the jury.

12        The parties also disagree about the meaning of the term "passageway." The '362 patent

13   clearly shows that the "passageway" is an *opening* on a surface of the "horizontal wall" separating

14   the dual chambers, and not a "long, narrow hole or tube" as suggested by AVC's cherry-picked

15   dictionary definition. *See* Dkt. No. 78 (Joint Claim Construction and Prehearing Statement) at 6. For

16   example, Figure 15 of the '362 patent depicts an opening (inlet 15) connecting the dual chambers of

17   reservoir 14. Tilton Decl., ¶20. Figure 15 also depicts that the opening (inlet 15) is generally circular,



1   which further supports Asetek's proposed construction.

2   Accordingly, Asetek's construction better captures the meaning of the claim term

3   "substantially circular passageway" in light of the disclosure of the '362 patent and the knowledge of

4   one of ordinary skill in the art.

5   **C.   "Positioned On" ('362 and '764 patents)**

6   The term "positioned on" appears in claims 14 and 17 of the '362 patent, and claim 1 of the

7   '764 patent. The parties agree that the term should be construed the same for both patents, and

8   propose the following claim constructions for this term:

| Claim Term | Asetek | AVC |
|---|---|---|
| "positioned on" | Plain and ordinary meaning. No construction needed. | above and physically contacted with |

13   Asetek proposes that the term "positioned on" be given its full scope consistent with the plain

14   and ordinary meaning of the term because nothing in the patent or its prosecution history indicates

15   that "positioned on" should be interpreted in any way other than its plain and ordinary meaning.

16   *Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362, 1365-68 (Fed. Cir. 2012)

17   ("The patentee is free to choose a broad term and expect to obtain the full scope of its plain and

18   ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope.").

19   AVC, on the other hand, contends that "positioned on" be construed narrowly to require an element

20   to be "above" and "physically contacted" with another element of the claimed liquid cooling system.

21   AVC's construction is inconsistent with the plain and ordinary meaning of "positioned on" and is

22   further contradicted by the plain language of the claims.

23   Specifically, claim 1 of the '764 patent recites that "the impeller [is] positioned on the

24   *underside* of the chassis and the stator [is] positioned on the *upper side* of the chassis." (Emphasis

25   added.) Thus, at least claim 1 of the '764 patent contemplates a broad interpretation of the term

26   "positioned on," which cannot be satisfied by AVC's proposed construction, which would require

27   *both* the "impeller" and the "stator" to be located "above," i.e., on the upper side, of the "double-

28   sided chassis." AVC's construction would thus render claim 1 of the '764 patent nonsensical and

13

1    cannot be correct. *Becton, Dickinson and Co. v. Tyco Healthcare Group*, 616 F.3d 1249, 1255 (Fed.

2    Cir. 2010).

3           AVC's proposed construction is further inconsistent with the plain language of claims 14 and

4    17 of the '362 patent. As discussed above with respect to the claim term "substantially circular

5    passageway," a person of ordinary skill in the art would readily understand that the "passageway"

6    that "fluidly couple[s]" the dual chambers of the "reservoir" is an opening on a surface of the

7    "horizontal wall" separating the two chambers. Tilton Decl., ¶20; *see also* Figure 15 (showing that

8    inlet 15, which connects the "upper" and "lower" chambers, is on a surface of the "horizontal wall").

9    Nothing in the plain language of claims 14 and 17 of the '362 patent requires the "passageway" to be

10   "above" the "horizontal wall."

11          Similarly, nothing in the claims, the specifications, or the prosecution histories support

12   limiting "positioned on" to a narrow construction that strictly requires "physical contact." As the

13   plain language of claim 1 of the '764 patent suggests, "positioned on" simply requires situating the

14   "impeller"/"stator" in relation to the "double-side chassis." In particular, nothing in the claim

15   language requires a direct connection between the "double-sided chassis" and the

16   "impeller"/"stator," which is implied by AVC's proposed construction requiring "physical contact."

17          Moreover, the intrinsic evidence relied on by AVC—Figure 12 and its related text (col. 16, ll.

18   4-11 of the '362 patent)—merely describe a specific embodiment of a heat sink. Nothing about

19   Figure 12 and its related text informs the meaning of "positioned on," nor does it support AVC's

20   narrow construction. The prosecution histories of the Asetek Patents also do not support limiting the

21   claims to the construction proposed by AVC.

22          Absent a special definition of "positioned on" or a disavowal of the full scope of the term in

23   the intrinsic record—none of which exists here—the term "positioned on" should be given its plain

24   and ordinary meaning. *See Phillips*, 415 F.3d at 1312-13 (stating that "the words of a claim 'are

25   generally given their ordinary and customary meaning'") (citation omitted); *see also Thorner*, 669

26   F.3d at 1365-68. Asetek, moreover, respectfully submits that the term "positioned on" is not a

27   technical term in the field of computer liquid cooling; the term has a common usage in the English

28

1    language, which the jury will readily understand in the context of the surrounding claim language.

2    No interpretation of "positioned on" is required.

3        **D.      "Horizontal Wall" ('362 patent)**

4        The parties have proposed the following constructions for the term "horizontal wall" in

5    claims 14 and 17 of the '362 patent:

| Claim Term | Asetek | AVC |
|:---:|:---:|:---:|
| "horizontal wall" | Plain and ordinary meaning, or in the alternative, a wall that is approximately parallel to the heat exchanging interface. | planar surface |

10        The asserted claims of the '362 patent requires the "upper" and "lower" chambers of the

11    "reservoir" to be separated by a "horizontal wall." Asetek proposes that the term be given the full

12    scope of its plain and ordinary meaning, because nothing in the patent or its prosecution history

13    indicates that "horizontal wall" should be interpreted in any way other than its plain and ordinary

14    meaning. *See Thorner*, 669 F.3d at 1365-68. In the event the Court finds that the term will benefit

15    from further clarification, Asetek proposes that the term be construed as "a wall that is

16    approximately parallel to the heat exchanging interface."

17        Claim 14 of the '362 patent requires the "upper" and "lower" chambers to be vertically

18    arranged with respect to each other and the "heat exchanging interface," which forms the lower

19    boundary wall of the "lower" chamber. Tilton Decl., ¶22. As a person of ordinary skill in the art

20    would readily understand, the "horizontal wall" separating the "upper" and "lower" chambers must

21    be at least approximately parallel to the "heat exchanging interface" in order to satisfy the claim

22    requirement that the dual chambers be vertically arranged. *Id.* This interpretation is supported by the

23    disclosure of the '362 patent. For example, Figure 15 (annotated on page 12, *supra*) shows that the

24    "horizontal wall" is parallel to the "heat exchanging interface."

25        AVC's proposed construction, on the other hand, is contradicted by Figure 15. To a person of

26    ordinary skill in the art, "planar" means a flat, two-dimensional surface. Tilton Decl., ¶23. Figure 15

27    of the '362 patent, however, shows channels 26 formed on the "horizontal wall" separating the

28    "upper" and "lower" chambers, thus demonstrating that the "horizontal wall" is *not* limited to a

planar surface. *Id.* While it is correct that a claim construction need not encompass every disclosed embodiment, here Figure 15 represents a preferred embodiment of the '362 patent, and a claim interpretation that excludes a preferred embodiment "is rarely, if ever, correct." *See Vitronics*, 90 F.3d at 1583. If AVC's proposed construction is adopted by the Court, the preferred embodiment depicted in Figure 15 will be outside the scope of the claimed invention. In contrast, Asetek's proposed construction is consistent with this preferred embodiment.

Asetek's proposed construction also specifies a directional frame of reference (i.e., the "wall" is horizontal to the "heat exchanging interface"), which further clarifies the meaning of the claim term. Tilton Decl., ¶22. Thus, if the Court finds that the term will benefit from further construction, it should adopt Asetek's construction, and reject AVC's impermissibly narrow and erroneous interpretation.

### E.    "Substantially Circular Passageway Positioned on the Horizontal Wall" ('362 patent)

This term appears in claim 14 of the '362 patent. While AVC simply refers to its proposed constructions for the terms "substantially circular passageway" and "horizontal wall," Asetek proposes a more straightforward, consolidated construction, as shown below:

| Claim Term | Asetek | AVC |
|---|---|---|
| "substantially circular passageway positioned on the horizontal wall" | a generally circular opening on a surface of the horizontal wall | See "substantially circular passageway" and "horizontal wall," above. |

As discussed above, a person of ordinary skill in the art would readily understand that "substantially circular passageway" in the '362 patent claims means an opening that is generally circular. Tilton Decl., ¶20; *supra*, pp. 11-12. Figure 15, which is a preferred embodiment of the '362 patent, further shows that inlet opening 15 (i.e., the "substantially circular passageway") is positioned *on a surface of* the "horizontal wall" separating the two chambers (annotated on page 12, *supra*). Simply put, Asetek's proposed construction provides a positional relationship between the "substantially circular passageway" and the "horizontal wall," which is largely ignored by AVC's proposed constructions of these terms. Accordingly, the Court should adopt Asetek's proposed

16

construction ("a generally circular opening on a surface of the horizontal wall") and reject AVC's disjointed constructions of two separate claim terms.

### F.   "Fluidly Coupled" ('362 and '764 patents)

The term "fluidly coupled" appears with different prepositions in claims 14 and 17 of the '362 patent, and claims 1, 6, 9, 13, 15, 27, 18, and 30 of the '764 patent. The parties agree that "fluidly coupled" should have the same construction for both patents. Asetek additionally requests that the different prepositions surrounding "fluidly coupled" in the patent claims be accommodated by construing "fluidly coupled together" (in claims 14 and 17 of the '362 patent) as "in fluid communication;" "fluidly coupled to" (in claims 1, 9, 13, 15 of the '764 patent) as "in fluid communication with;" and "fluidly couple" (in claim 6 of the '764 patent) as "is in fluid communication with." Asetek's construction is the same across these various claim terms: "in fluid communication."

| Claim Term | Asetek | AVC |
|---|---|---|
| "fluidly coupled" | in fluid communication | fluidly connected/ connect |

The term "fluidly coupled" is used in the '362 and '764 patent claims to denote fluid communication between the dual chambers of the "reservoir" (claims 14 and 17 of the '362 patent; claims 1, 6, 15, 27, 28, and 30 of the '764 patent) and between the "reservoir" and the heat radiator (claims 9 and 13 of the '764 patent). As shown in Figure 8 of the '362 patent (and identical Figure 7 of the '764 patent), and as discussed above, the claimed cooling system is a closed-loop system wherein the cooling fluid flows continuously through the reservoir and between the reservoir and the heat radiator during operation. Tilton Decl., ¶26. This continuous flow of cooling liquid between two features or parts of the cooling system is best captured by Asetek's proposed construction: "in fluid communication." This is also consistent with how fluid flow between the dual chambers is recited in independent claim 10 of the '764 patent, which recites that the "pump chamber" is "coupled with the thermal exchange chamber through one or more passages configured for *fluid communication* between the [two chambers]...." Ex. 2, claim 10 (emphasis added).

AVC's proposed construction, on the other hand, is overly limiting and inconsistent with claim constructions of "coupled" by various courts (discussed below). This is because construing the term "fluidly coupled" as "fluidly connected" might imply a direct connection between two parts or features of the cooling system. Tilton Decl., ¶27. Such direct connection is, however, contradicted by the disclosures of the Asetek Patents, because fluid flow between two features or parts of the claimed cooling system can be either direct or indirect (i.e., fluid flow between two features or parts can be via one or more intermediate elements). *Id.* For example, Figure 8 of the '362 patent (and identical Figure 7 of the '764 patent) show *indirect* fluid flow between the reservoir and the radiator via tubes 24 and 25. *Id.* Similarly, Figure 20 (annotated in page 5, *supra*) shows that fluid flow between pump chamber 46 and thermal exchange chamber 47A is *indirect* via passage 48 (which passes through intermediate member 47). Ex. 2, col. 22, ll. 33-39. On the other hand, the "upper" and "lower" chambers of reservoir 14 (depicted in Figure 15 of both patents) are connected *directly* via inlet opening 15. Tilton Decl., ¶27. Thus, the disclosure and claims of the '362 and the '764 patents contemplate both direct and indirect fluid flow between different features or parts of the cooling system, which is captured best by Asetek's proposed construction.

Moreover, multiple courts have construed "coupled" to include both direct and indirect connection, consistent with its plain and ordinary meaning. *E.g., MEMS Tech. Berhad v. Int'l Trade Comm'n*, 447 Fed. App'x 142, 151-53 (Fed. Cir. 2011) (rejecting defendant's argument that "coupled" required direct connection; construing "coupled" according to its plain and ordinary meaning, which includes direct or indirect connection.). Indeed, in the Northern District of California, "couple" has been construed to mean "direct or indirect" linking or joining, consistent with its plain and ordinary meaning. *Level One Commc'ns, Inc. v. Seeq Tech., Inc.*, 987 F. Supp. 1191, 1196, n.1 (N.D. Cal. 1997). AVC's proposed construction requiring direct connection is inconsistent with these earlier court decisions.[3]

---

[3] In the prior litigations involving the '362 and '764 patents, Judge Chen concluded that "coupling" in isolation supports both direct and indirect connection. Ex. 7 at 10. That said, he found that claim 1 of the '362 patent is more limited because he found it specifies a direct means of connection between the dual chambers via a plurality of passageways (and thereby foreclosed indirect connection between the chambers via the inlet and outlet tubes and the radiator). *Id.* at 10-12. No such concern

(continued...)

In contrast, Asetek's proposed construction ("in fluid communication") implies both direct and indirect connection, which is consistent with the patent disclosures and earlier court decisions. This Court should adopt Asetek's proposed construction for the same reasons.

### G.    "Placed in Separable Thermal Contact" ('362 patent)

This term appears in claim 14 of the '362 patent. The parties propose the following constructions for these terms:

| Claim Term | Asetek | AVC |
|---|---|---|
| "placed in separable thermal contact" | placed detachably and in thermal contact | Plain and ordinary meaning. No construction needed. |

The term "separable thermal contact" does not have an ordinary meaning, and thus it should be interpreted in the context of the '362 patent's disclosure. *See Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1164 (Fed. Cir. 2004) ("Where a claim term has no ordinary and customary meaning, a court must resort to the remaining intrinsic evidence—the written description and the prosecution history—to obtain the meaning of that term."); *see also Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 991 (Fed. Cir. 2007) ("Without a customary meaning of a term within the art, the specification usually supplies the best context for deciphering claim meaning.").

The disclosure of the '362 patent supports Asetek's construction. First, the '362 patent's disclosure makes it clear that the pump unit (including reservoir 14) is mounted on the motherboard via fastening means, such as, frames, braces, screws, bolts, rivets, etc. *See, e.g.,* Ex. 1, col. 8, ll. 23-37; col. 9, ll. 42-47, ll. 56-57; col. 17, ll. 47-58; Figures 4 and 5. Since these fastening means can be removed if and when needed, a person of ordinary skill in the art would readily understand that the pump unit is mounted *detactably* on the motherboard. Second, the '362 patent also discloses that the pump unit is mounted in such a way that the "heat exchanging interface" (referred to as heat exchanger 4 in the patent) is placed in close thermal contact with the CPU in order to facilitate

---

(...continued)

exists here because Asetek has not asserted claim 1 of the '362 patent. Moreover, Asetek's infringement positions in this case do not rely on any such indirect connection between the dual chambers via the radiator. Bhattacharyya Decl., ¶10.

1   dissipation of heat from the CPU to the cooling liquid in the reservoir. *See, e.g.,* Ex. 1, col. 2, ll. 5-8;

2   col. 9, ll. 42-47, ll. 56-57; *see also* Tilton Decl., ¶12. The term "placed in separable thermal contact"

3   represents these two distinct features of the claimed invention: first, the pump unit is mounted in

4   such a manner that it can be detached from the motherboard if and when required; and second, the

5   pump unit is mounted in close thermal contact with the CPU to facilitate heat transfer. Asetek's

6   proposed construction incorporates and clarifies these distinct features within the claim term

7   "separable thermal contact."

8        AVC has not proposed a construction for this term or described what it alleges is the plain

9   meaning. Asetek respectfully submits that adopting Asetek's proposed construction will provide

10   clarity to the jury in understanding the dual meaning of this claim term. The Court should adopt

11   Asetek's construction for at least this reason.

12       **H.**    **"Separably Thermally Coupling" ('362 patent)**

13        This term appears in claim 17 of the '362 patent. The parties propose the following

14   constructions for these terms:

| Claim Term | Asetek | AVC |
|:---:|:---:|:---:|
| "separably thermally coupling" | placed detachably and in thermal contact | Plain and ordinary meaning. No construction needed. |

18        As discussed above with respect to the term "separable thermal contact" in claim 14, the term

19   "separably thermally coupling" in claim 17 similarly represents two distinct features of the claimed

20   invention: first, the pump unit is mounted detachably on the motherboard; and second, the pump unit

21   is mounted in close thermal contact with the CPU to facilitate heat transfer. Both these features are

22   fully supported by the disclosure of the '362 patent. *See* Ex. 1 at col. 2, ll. 5-8; col. 8, ll. 23-37; col.

23   9, ll. 42-47, ll. 56-57; col. 17, ll. 47-58. Asetek's proposed construction will assist the jury in

24   understanding these two distinct features incorporated within a single claim term.

25       **I.**    **"The Heat Exchange Interface Being Removably Attached / Coupled To**
26           **The Reservoir" ('362 patent)**

27        Claim 14 of the '362 patent recites that "the heat exchange interface [is] removably *attached*

28   to the reservoir," and claim 17 of the '362 patent recites that "the heat exchange interface [is]

removably *coupled* to the reservoir." (Emphasis added.) The parties agree that both these terms should be construed the same, and have proposed the following claim constructions:

| Claim Term | Asetek | AVC |
|---|---|---|
| "the heat exchange interface being removably attached/ coupled to the reservoir" | the heat exchanging interface and the rest of the reservoir having a non-unitary construction | Plain and ordinary meaning. No construction needed. |

Although AVC does not agree with Asetek's construction, it has not proposed a competing construction. Instead, AVC insists that the term be given its plain and ordinary meaning. The term "the heat exchange interface being removably attached/coupled to the reservoir," however, does not have an ordinary meaning, and thus should be interpreted in the context of the '362 patent's disclosure. *See Goldenberg,* 373 F.3d at 1164 (Fed. Cir. 2004); *see also O2 Micro,* 521 F.3d at 1360 (finding that when the parties dispute a claim term, the Court should resolve it).

This claim term, and non-infringement positions associated with this term, were heavily litigated and even appealed to the Federal Circuit in *Asetek Danmark A/S v. CMI USA, Inc.* There, defendant CMI USA took the position that this claim term means that the "heat exchange interface" (i.e., the cold plate) must be removable by a user using readily available tools, and further that the device must remain operational after removal of the cold plate. Tilton Decl., ¶25. Asetek, on the other hand, maintains that the removable cold plate limitation simply means that the reservoir and the cold plate are not a unitary, one-piece structure. *Id.* Thus, this claim term has already been subject to two different interpretations. Resolving the conflicting interpretations in view of the intrinsic record would be helpful to the jury. *See Kaneka Corp. v. Xiamen Kingdomway Grp. Co.,* 790 F.3d 1298, 1305 (Fed. Cir. 2015) (finding that because the term "sealed" may have more than one plain and ordinary meaning, the appropriate definition needed to be ascertained from the intrinsic evidence); *In re Glaug,* 283 F.3d 1335, 1340 (Fed. Cir. 2002) (finding the word "intermittently" was susceptible to various meanings and would be limited by the inventor's lexicography).

Here, Asetek's proposed construction of "the heat exchange interface being removably attached/coupled to the reservoir" is supported by the disclosure of the '362 patent and how one of ordinary skill in the art would understand the benefits of the patented invention from reviewing the patent. The '362 patent states that one object of the invention is to provide a liquid cooling solution that can be produced at low cost.  *See, e.g.,* Ex. 1 at col. 1, ll. 53-56.  The '362 patent further discloses that the removable cold plate allows the reservoir to be made of plastic, while the cold plate itself can be made of a heat conductive metal, such as copper or aluminum (which are much more expensive than plastic). *See, e.g.,* Ex. 1 at col. 4, ll. 52-66; col. 5, ll. 35-43; Tilton Decl., ¶24. This reduces production costs. Tilton Decl., ¶ 24. One of ordinary skill in the art would further understand that a removable cold plate also provides manufacturing benefits and flexibility, allowing for factory-floor swap outs of cold plates tailored to different CPUs' (or GPU's) characteristics. *Id.*

In contrast, if the cold plate is irremovably attached/coupled to the reservoir, i.e., the reservoir and cold plate are a one-piece structure, then the entire component (reservoir and cold plate) would have to be constructed of heat-conductive metal, which would increase manufacturing costs and reduce manufacturing flexibility. *Id.* Moreover, if the cold plate is irremovably attached/coupled to the reservoir, then the entire reservoir component (and not just the cold plate) would have to be replaced whenever there is any change in the configuration of the corresponding processing unit, thus increasing manufacturing and/or refurbishing costs of the cooling device. *Id.* It would be clear to one of ordinary skill in the art that the removable cold plate limitation is directed to these manufacturing benefits of reduced costs and increased flexibility, and that it is not intended to be a benefit for the user (as previously argued by CMI USA). *Id.* In fact, nothing in the '362 patent supports the interpretation espoused by CMI USA.

One of ordinary skill in the art would readily understand that the above-identified manufacturing benefits of a removable cold plate can only be achieved if the cold plate and the remaining reservoir body are essentially a non-unitary construction, i.e., not a one-piece structure. Tilton Decl., ¶25. This is precisely the construction proposed by Asetek. Because claim terms must be understood in the context of the patent disclosure (*see Kaneka*, 790 F.3d at 1305; *In re Glaug*, 283 F.3d at 1340), the Court should adopt Asetek's proposed construction for this term.

**V.    CONCLUSION**

The Court should adopt Asetek's proposed constructions for each of the disputed terms of the Asetek Patent.

Dated: September 29, 2017                    FINNEGAN, HENDERSON, FARABOW,
                                                                          GARRETT & DUNNER, LLP


                                                             By:    /s/Arpita Bhattacharyya
                                                                          Arpita Bhattacharyya
                                                                          Attorneys for Defendant and Counterclaimant
                                                                          ASETEK DANMARK A/S